UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Marlin O. Osthus, Regional Director
of the Eighteenth Region of the National Labor
Relations Board,

        Plaintiff,

    v.

A.S.V., Inc., d/b/a/ Terex,

        Defendant,
  and

International Brotherhood of Boilermakers,
Iron Ship Builders, Blacksmiths, Forgers,
and Helpers, AFL-CIO,

        Amicus.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-4445 ADM/HB

_____

Tyler J. Wiese, Esq., National Labor Relations Board, Region 18, Minneapolis, MN, on behalf of Plaintiff.

Charles P. Roberts, III, Esq., Constangy, Brooks & Smith, LLP, Winston Salem, NC and Michael John Moberg, Esq., Briggs & Morgan, PA, Minneapolis, MN, on behalf of Defendant.

Jason R. McClitis, Esq., Blake & Uhlig, P.A., Kansas City, KS, and Richard L. Kaspari, Esq., Metcalf, Kaspari, Engdahl & Lazarus, PA, St. Paul, MN, on behalf of Amicus.
_____

## I. INTRODUCTION

      This matter came before the undersigned United States District Court Judge on February 3, 2015 on the National Labor Relations Board's ("Board") Petition for Injunction under Section 10(j) of the National Labor Relations Act ("the Act") [Docket No. 1]. For the reasons discussed

below, the Board's Petition is granted in part and denied in part.[1]

## II. BACKGROUND

This cases arises under Section 10(j) of the Act based on alleged unlawful labor practices by A.S.V., Inc., d/b/a Terex ("Terex") managers who, according to the Board, sought to dissuade employees from voting to unionize. Administrative Law Judge David I. Goldman held hearings on the matter in November and December 2014. Judge Goldman will ultimately decide the merits of this case and his decision will be appealable to the Board only. The parties agree that a final ruling from Judge Goldman is not anticipated for quite some time. In the meantime, the Board seeks injunctive relief of a remedial bargaining order under section 10(j) of the Act, which states:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

 29 U.S.C. § 160 (j).

**A. The parties**

Marlin Osthus, the named Plaintiff, is the Regional Director of Region 18 of the Board

---

[1] When the Board filed its Petition on October 22, 2014, it also filed a Motion to Try Section 10(j) Petition Based on Partial Administrative Record [Docket No. 3]. The parties then filed responsive letters [Docket Nos. 5 and 10] which expressed opposing views about the necessity of an evidentiary hearing before this Court. By the time Respondent filed their Memorandum in Opposition, all issues related to Petitioner's Motion to Try Section 10(j) Petition Based on Partial Administrative Record [Docket No. 3] were moot. See Def.'s Mem. Opp. Inj.[Docket 36] 50-51("Although Terex initially took the position that an evidentiary hearing should be conducted, Terex no longer seeks such a hearing.").

which investigates charges of unfair labor practices in Minnesota, Wisconsin, Iowa, North Dakota, and South Dakota.  See Home, NLRB, http://www.nlrb.gov/region/minneapolis (last visited March 25, 2015).

Terex is a global lifting and material handling solutions company.  See About, TEREX, http://www.terex.com/en/ (last visited March 25, 2015).  Terex's factory in Grand Rapids, Minnesota manufactures compact track loaders and skid steer loaders.  Pl.'s Mem. Supp. Inj. [Docket No. 15] 11.

**B.  Paint and assembly units seek to unionize**

In January 2014,[2] Terex employees contacted representatives from the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, and the AFL-CIO ("the Union") to discuss representation.  Pl.'s Mem. Supp. Inj., Ex. 2 ("ALJ Transcript") 467, 521.  The paint unit and the assembly unit at Terex both sought to unionize.  By May, sufficient support existed among the workers for the Union to file representation petitions with Terex's regional office.  On June 18, the paint unit voted in favor of unionization.  The assembly unit vote was scheduled for June 25.  As of June 4, a majority of assembly unit workers (26 of 41) submitted authorization cards in support of the Union.[3]  Between June 4 and June 25, Terex managers allegedly sought to dissuade the assembly unit from unionizing.  On June 25, in a 26-15 vote, the assembly voted against unionizing.[4]

---

[2] All dates refer to the year 2014, unless noted otherwise.

[3] Terex argues that at least six authorization cards are invalid and should not be counted, thus defeating any alleged majority support for the Union.

[4] Initially, the "undercarriage unit," comprised of 15 employees, sought to unionize. Terex argued the undercarriage unit was an inappropriate unit and a hearing was held on May 20.  The Regional NLRB Director issued a ruling on May 29, finding that the undercarriage unit

**C. Alleged unlawful labor practices**

    **1. Section 8(a)(1) and Section 7 of the Act**

The Board alleges Terex violated both Section 8(a)(1) and 8(a)(3) of the Act, but only the 8(a)(1) violations are at issue here. Section 8(a)(1) states that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Section 157 ("Section 7") states:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a)(3) of this title.

29 U.S. § 157.

    **2. Statements by Terex manager James DiBiagio**

On June 19, the day after the paint unit voted to unionize and approximately one week before the assembly workers' scheduled vote, Terex's local manager, James DiBiagio ("DiBiagio"), called a mandatory meeting of the assembly unit workers. Terex concedes he read a verbatim powerpoint presentation. DiBiagio's statements included:

> Nobody *WON* anything with that election yesterday . . . certainly not the painters because now they have taken a huge risk with their decision to be represented by the union.

---

was inappropriate. An election among 42 assembly workers was ordered. Pl.'s Mem. Supp. Inj., Ex. 3 at 64 ("Election Decision"). Terex filed a timely objection, arguing the appropriate bargaining unit would include at least 50 additional workers, thereby nullifying any perceived majority support for the Union as advocated by the Board. The Board denied review, with one member of the three-person panel dissenting. See Ord. Deny. Review, 360 NLRB No. 138.

> To me credibility is everything.  If I can't trust you, you are nothing to me . . . I have worked my ass off to do everything I could possibly do to help you and I have the track record to prove it.  You know you can trust me. ... Yet you want to bring a damn union for what ??  What have they done to earn your trust?
>
> I have had to fight for your existence each and every day to keep the wolves at bay and just when we build a little breathing room here we go pulling a dumbass move like bringing in a union. ... Orders are plummeting, we are going to go through a rough time over the next several months and instead of pulling together to weather the storm you decide to bring in a union?  Unfuckin[g] believable.
>
> Terex had multiple unionized factories, most of them are gone. ... I had to close 4 union plants in my career—UAW, UAW, Asbestos and haz waste workers, Teamsters.  Unionized facilities simply struggle to remain competitive.  I have had to look into the eyes of a lot of people and tell them their plant was closing.  That's why I have such a passion for this and why it really pisses me off when I see the audacity in this room after all the company has done for you.
>
> By doing all of this union crap you've thrown us back almost all the way to square one.
>
> I hope you all are smart enough not to follow suit and make the same mistake because what you decide will determine the future direction of the business.

Pl.'s Mem Supp. Inj., Ex. 3 at 139-151 ("DiBiagio June 19 Powerpoint").

### 3. Statements made by George Ellis, president of construction division

Two days before the June 25 assembly election, the president of Terex's construction division, George Ellis ("Ellis"), flew from Texas to Minnesota to speak with the assembly employees.  Ellis expressed support for the statements made by DiBiagio on June 19.  ALJ Transcript 561-62, 598, 619-20, 630, 994.  Ellis also emphasized that he had control of where work was placed and that plants in Oklahoma and Indiana could absorb Grand Rapids' work load.  Id. 561-62, 598, 620, 630, 994.  Ellis also reminded the workers that Terex used to have many Union plants but now only had one.   Finally, he indicated that even if the Union were voted in, he would not negotiate with the Union.

### 4. Individual statements made by mid-level managers

Terex managers allegedly reiterated the statements made by DiBiagio and Ellis in their individual conversations with employees. ALJ Transcript 617. The day before the election, mid-level managers approached employees while they were working. Id. 563-65, 599-602, 631-32, 971-76, 995-96. The employees were told that if they voted for the Union, Terex would close the Grand Rapids plant. Id. 599-600, 631-33, 643-44, 971-76.

## D. Post-election developments

### 1. Letter from Ellis to all employees at Grand Rapids plant

The Union filed unfair labor practice charges in July and the initial complaint was filed on September 26. On October 7, Ellis sent a letter to all employees which included the following statement:

> So that there are no misunderstandings, I want to give you the following emphatic assurances: Terex will not close, or threaten to close, the Grand Rapids facility, or any other facility, because team members engage in union activity or select a union to represent them. All business decisions regarding any facility will be based solely upon lawful economic and business considerations.

Pl.'s Mem. Supp. Inj., Ex. 3 at 278-80 ("Ellis Letter"). On October 13, DiBiagio conducted a town hall meeting with employees where he reiterated the sentiments expressed in Ellis' letter.

### 2. Ongoing Union efforts to organize workers at Grand Rapids plant

The Union has continued its organizing efforts at the Grand Rapids Terex facility through bi-weekly meetings. Mauller Decl. [Docket No. 35] Ex. 1. Handbilling efforts have also continued. Nevertheless, the Union has observed a sharp decline in participation. Decl. Weismann [Docket No. 35] Ex. 2.

### III.  DISCUSSION

**A.  Preliminary Injunction Standard under the Act**

Section 10(j) of the Act, first enacted in 1947, is a limited exception to federal policy against labor injunctions. Sharp v. Parents in Cmty. Action, Inc., 172 F.3d 1034, 1037 (8th Cir. 1999) ("PICA").  Injunctions under §10(j) should be granted only in "serious and extraordinary" cases when "the remedial purpose of the Act would be frustrated unless immediate action is taken." Minnesota Mining & Mfg. Co. v. Meter, 385 F.2d 265, 270 (8th Cir. 1967) ("3M").  In PICA, the Eighth Circuit endorsed application of the traditional Dataphase preliminary injunction factors in the unfair labor practices context. PICA, 172 F.3d at 1038-39.  The Dataphase Sys., Inc. v. C.L. Sys., Inc. factors include: (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between the harm alleged and the harm that the relief may cause the non-moving party, (3) the likelihood of the movant's ultimate success on the merits, and (4) the public interest.  640 F.2d 109, 114 (8th Cir. 1981) (en banc).

"The Dataphase factors are not a rigid formula." PICA 172 F.3d at 1034.  "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Id. (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)).  The question in cases brought under Section 10(j) is whether the extraordinary remedy of a preliminary injunction is "necessary either to preserve the status quo or to prevent frustration of the basic remedial purpose of the Act." Id. (citing 3M, 385 F.2d at 270).  Only if the Board clears the "relatively high hurdle" of showing irreparable injury does the court need to proceed to consider likelihood of success on the merits in the context of the relative injuries to the parties and the public.  PICA 172 F.3d at 1039 (citing Dataphase 640 F.2d at 113).

**1. Threat of irreparable harm**

The Board argues that the statements made by Ellis and the Terex management chilled the assembly unit workers' support for the Union, necessitating the injunctive relief of an interim bargaining order from this Court. The "dramatic loss of support (over 40%) demonstrates the chilling effect of Respondent's unlawful conduct." Pl.'s Mem. Supp. Inj. 20. Absent this relief, the Board argues that irreparable harm will occur in that "[t]he employees' support for their chosen representative will predictably erode as the Union is unable to adequately protect them or affect their working conditions through collective bargaining during the period that the case is pending before the Board." Pl.'s Mem. Supp. Inj. 22. Terex contends issuing an interim bargaining order would be an inappropriate remedy because no bargaining relationship between Terex and any union representing the assembly unit currently exists. Rather than preserving an already existing status quo, Terex argues imposing an interim bargaining order would create a new status quo by forcing Terex to bargain with the Union pending the Board's decision. Terex also argues that the Board has failed to produce evidence showing that the Board's disposition of this case will be ineffective absent a preliminary injunction.

There is no Eighth Circuit precedent on the propriety of issuing an interim bargaining order under the circumstances presented in this case, that is, where a bargaining relationship was not previously established.[5] Other Circuits are split: in <u>Boire v. Pilot Freight Carriers, Inc.</u>, 515 F.2d 1185, 1194 (5th Cir. 1975), the Fifth Circuit cautioned that "interim bargaining involves too

---

[5] In 1979, Judge Devitt in the District of Minnesota denied the Board's request for an interim bargaining order where the employees were not previously represented by a union, but the Eighth Circuit vacated that order at the request of the Board for mootness. As such the decision is a legal nullity. <u>See</u> <u>Wilson v. Hart Ski Mtf. Co.</u>, 472 F.Supp 484, 485 (D. Minn. 1979), <u>vacated by</u> <u>Wilson v. Hart Ski Mtf. Co.</u>, 617 F.2d 1313 (8th Cir. 1980).

large a step for this court to take by means of an injunctive vehicle designed to preserve issues for ultimate determination by the Board.  Conversely, the First and Second Circuits have demonstrated a willingness to grant interim bargaining orders under particularly egregious circumstances.

The effectiveness of an interim bargaining order to help restore the status quo and ensure effectiveness of the Board's ultimate remedy in this case will be considered in turn.

### i. Restoration of status quo

"Injunctive relief has been found appropriate to either preserve the status quo or to prevent frustration of the basic remedial purposes of the Act . . . ."  Chester ex rel. NLRB v. CMPJ Enter., Civ. No. 07-2530, 2007 U.S. Dist. LEXIS, at *5 (D. Minn. July 2, 2007) (citing Bloedorn v. Francisco Foods, Inc., 276 F.3d 270 (7th Cir. 2001)).  The status quo that deserves protection under Section 10(j) is "not the illegal status quo which has come into being as a result of the unfair labor practices being litigated."  Seeler v. Trading Port, Inc., 517 F.2d 33, 38 (2nd Cir. 1975).  Rather, Section 10(j) was intended to preserve or restore the status quo as it existed prior to the unfair labor practices.  Id.  Here, issuing an interim bargaining order would alter the status quo as it existed prior to Terex's alleged unfair labor practices because no bargaining relationship previously existed between the Assembly workers and the Union.  Creating a new relationship between the employer and workers—who may or may not desire such a relationship and have not previously been in such a relationship—is not an appropriate injunctive remedy under Section 10(j).  See 3M, 385 F.2d at 273 (holding that the status quo is the "last uncontested status which preceded the pending controversy."); Boire, 515 F.2d at 1193 (holding that issuance of an interim bargaining order where one did not previously exist would

"materially alter [the status quo], creating by judicial fiat a relationship that has never existed.").

### ii. Ensuring effectiveness of Board remedy

Injunctive relief may still be appropriate to ensure the effectiveness of the Board's ultimate remedy. Irreparable injury can be established by showing that the alleged unfair labor practice "so chilled on-going protected employee activity, such as collective bargaining or union organizing, that delay will frustrate the effectiveness of the Board remedies." PICA 172 F.3d at 1040. The Court is mindful of the difficulty the Union may face in seeking to organize workers pending the Board's decision, which will likely take one year or more. As aptly stated by the Second Circuit in Seeler:

> Just as a cease and desist order without more is ineffective as final relief in a Gissel situation, it is, in certain cases, also insufficient as interim relief. If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective.

Seeler, 517 F.2d at 37-38. In remanding to the District Court to determine if the alleged unfair labor practices were so serious that a interim bargaining order was warranted, the Seeler Court emphasized that:

> [T]he issuance of a bargaining order by a district court after a union has lost an election is, undoubtedly, a serious measure which should not be undertaken whenever a claim of unfair labor practices is made. We hold only that when the Regional Director makes a showing based on authorization cards, that the union at one point had a clear majority and that the employer then engages in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j).

Id. at 40.

The alleged unlawful practices undertaken by Terex are less severe than those addressed

in Seeler and other cases where interim bargaining orders have been upheld. In Seeler, a majority of employees signed cards designating the local union as their bargaining representative. Id. at 35. The employer refused to voluntarily recognize the union. The employees went on strike and when they returned to work as instructed, they were issued lay-off slips. Id. In the end, twenty strikers were permanently laid off. The Board election was held several months later and failed. Id. Even harsher employer action occurred in Asseo v. Pan American Grain Co. In Asseo, the First Circuit affirmed granting an interim bargaining order where the employer allegedly interrogated employees about their support for the union, discharged employees because of their support for the union, threatened employees with physical harm, loss of wages and benefits. 805 F.2d 23, 24 (1st Cir. 1986). Testimony before the District Court showed that the employer continued its threats of discharge and plant closings while the case was pending before the Administrative Law Judge. Id. at 26. The First Circuit concluded that "[i]f an employer is allowed to continue overt violations of the Act, it may in extreme cases succeed in so undermining union strength as to render ineffective any final relief that might be afforded by the Board." Id.

Here, the Board argues that threats of plant closure were made prior to the Union election to dissuade Union support. Although a majority of assembly unit workers ultimately voted against unionizing, there has been no allegation of Union supporters being laid off or facing other reprisals. The statements made by Ellis and the Terex management may be found to violate Section 8(a)(1), but do not rise to the level of threats of physical harm, actual layoffs and

other reprisals made in Seeler and Asseo.[6]  Moreover, Ellis and DiBiagio attempted to clarify their position in regard to the assembly workers' right to unionize after the formal complaint was filed, emphasizing that no reprisals would be taken against workers who chose to support the union.  This stands in stark contrast to the employer in Asseo, who continued with severe threats against his employees while the administrative process was ongoing.  In sum, the alleged threats made in this case are less severe than those in cases where injunctive relief has been granted.

### iii.  Dispute regarding majority support

Courts have also been reluctant to issue interim bargaining orders where there are questions about whether a valid majority in support of the Union was ever reached.  See Lev ex rel. NLRB v. Novelis Corp., 2014 U.S. Dist. LEXIS 123059 at *16 (N.D.N.Y. Sept. 4, 2014) (noting that the question of irreparable harm "cuts both ways" and where violations of the Act were mild in nature and/or a majority of employees did not intend to authorize the Union, the Union should not be "thrust upon them.").  In this case, Terex challenges the legality of the assembly unit as an appropriate bargaining unit under Eighth Circuit law.  In NLRB v. Cell Agricultural Mnfg Co., the Eighth Circuit held that when considering proper bargaining units, the Board must consider employees "shared community of interests," including "bargaining history, operational integration, geographic proximity, common supervisor, similarity in job

---

[6] Terex acknowledges that DiBiagio's statements were "provocative," but argues they did not violate Section 8(a)(1).  Def. Mot. Opp. Inj. [Docket No. 36] 9.  Ellis denies making any unlawful statements to the assembly workers.  Terex argues that the evidence supporting the Board's allegation that Ellis made threats to the workers is "weak, to the point of bordering on nonexistent."  Def. Mot. Opp. Inj. at 10.  The mid-level managers who are alleged to have made individual threats deny making any threats.  Def. Mot. Opp. Inj. at 13.

function, and employee interchange." 41 F.3d 389, 395-97 (8th Cir. 1994). Terex argues that at least 50 additional workers share community interests with the 41 assembly workers who voted in the election. One member of the three-person NLRB panel who considered this issue agreed with Terex's argument, concluding that "sufficient facts regarding functional integration and other interests shared by various assembly and non-assembly production and maintenance employees" deserved further review. See Ord. Deny. Review, 360 NLRB No. 138. Whether the assembly unit is an appropriate bargaining unit is not an issue to be determined by this Court, but the record reflects that the positions of both parties have engendered support on third-party review.

Terex also challenges the Union's alleged majority based on validity of the Union cards. The "authorization for representation" cards state "this card may be used to gain voluntary recognition from the employer or to gain an election through NLRB or both." Pl.'s Mem. Supp. Inj., Ex. 3 at 155 ("Sample Card"). Terex argues that using the cards to support a court ordered interim bargaining order is improper. Terex also argues that one employee who solicited cards represented that the card "really didn't mean a thing and the employee could vote either way, it was his decision yes or no." ALJ Transcript at 607-08. Terex argues cards signed under these circumstances are invalid because the representation contradicts the plain language on the cards, thus invalidating all cards solicited in that manner. Finally, Terex challenges the validity of three cards that do not name Terex as the employee's employer. Terex concedes this Court need not resolve the question of whether the dual purpose cards are valid, but argues the alleged misleading statements made to secure several of the cards—in addition to the failure to name Terex on several cards—casts doubt on whether the Union ever had majority support. These

disputes also weigh against issuance of an interim bargaining order.

Because the unlawful labor practices alleged in this case are less severe than other cases where interim bargaining orders were issued, and in light of the challenges made by Terex regarding the assembly unit's alleged majority support for the Union, an interim bargaining order will not be issued. It should be emphasized, however, that nothing in this order should be read to condone the alleged threats made by Terex. Threats of lay offs or plant closure as retaliation for union support are illegal under the Act and must cease immediately. To ensure that all workers appreciate their rights under the Act, some intermediate relief will be granted, as detailed below.

## IV. CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the Board's Petition for Injunctive relief [Docket No. 1] is **GRANTED IN PART** and **DENIED IN PART**, as follows:

A. Terex is **HEREBY ENJOINED FROM** making any threats or coercive statements to employees that may violate Section 8(a)(1) or Section 7 of the Act, including, but not limited to: threats of plant closure, threats of adverse economic consequences or other reprisals toward employees who support the Union, and threats that supporting the Union is futile because Terex will not negotiate in good faith;

B. Terex shall post copies of this Order at its Grand Rapids facility where notices to employees are customarily posted. Said posting shall be maintained during the Board's administrative proceeding free from all obstructions and defacements, and agents of the Board shall be granted reasonable access to notice area to monitor compliance with this posting requirement;

C. Within fifteen (15) days of the issuance of this Order, Terex shall submit a sworn affidavit from a responsible official of Terex describing with specificity the manner in which Terex has complied with the terms of this Order, including the exact locations of the posted documents;

D. To the extent the Board's Petition for Injunction Under Section 10(j) of the Act [Docket No. 1], seeks an interim bargaining Order, the motion is **DENIED**; and

    E.    Petitioner's Motion to Try Section 10(j) Petition Based on Partial Administrative Record [Docket No. 3] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: April 2, 2015.